# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | CRIMINAL NO. |
| | § | 3:07-CR-289-M (13 and 14) |
| KEVIN J. DEAN (13) and JOHN J. | § | |
| LEWIS (14) | § | |
| | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are separate Motions to Sever by Defendants Kevin J. Dean and

John J. Lewis. The Motions require the Court to address two related issues: (1) whether

joinder is proper under Fed. R. Crim. P. 8(b); and (2) whether, assuming joinder under

Rule 8(b) is proper, consolidation would result in compelling prejudice to either Dean or

Lewis, warranting severance under Fed. R. Crim. P. 14(a).

The Court determines that Dean and Lewis's alleged acts, and the acts alleged in

Counts Ten and Fifteen, reveal the existence of an overarching affordable housing

scheme. Interconnected in time, place, manner, and membership, the factual predicates of

Counts Ten and Fifteen were part of a single series of transactions, permitting their joint

trial under Rule 8(b).[1]

The Court reserves until the deadline to be set for all Defendants seeking

severance to file appropriate motions, a determination of whether Counts Ten and

Fifteen, forming a single trial unit, are sufficiently related to Counts One through Nine

and Counts Twenty-One through Twenty-Five. The Court notes that these Counts

---

[1] Joinder of counts subsidiary to Counts Ten and Fifteen is proper because these rely on the same series of
transactions as underlie the conspiracy counts.

collectively name only three Defendants -- Brian L. Potashnik, Cheryl L. Potashnik, and Gladys E. Hodge. The Court similarly reserves a determination of whether joint trial of Count Eighteen and Counts Ten and Fifteen is proper.[2] Accordingly, Dean and Lewis's Motions are **DENIED**, although the Court reserves the issues referenced above. This Order is without prejudice to any Defendants other than Dean, Lewis, and Rickey E. Robertson urging severance of Counts Ten and Fifteen by the specified deadline.

## FACTUAL BACKGROUND

The Indictment names Dean in two counts: Count Fifteen (Conspiracy to Commit Extortion) and Count Twenty (Conspiracy to Commit Money Laundering). Lewis is named in those same two counts, as well as Count Seventeen (Extortion by Public Officials and Aiding and Abetting). In addition to Counts Fifteen and Twenty, the Indictment includes four other conspiracy counts: Counts One, Ten, Eighteen, and Nineteen. This Rule 8(b) analysis focuses on the relationship among the activities alleged in Counts Ten and Fifteen. Only for the sake of the joinder issues, the Court presumes as true the factual allegations contained in the Indictment.[3]

*Count Ten*

Count Ten charges eight Defendants, Sheila D. Farrington, Brian L. Potashnik, Cheryl L. Potashnik, Donald W. Hill, D'Angelo Lee, Rickey E. Robertson, Andrea L. Spencer, and Ronald W. Slovacek with Conspiracy to Commit Bribery Concerning a Local Government Receiving Federal Benefits. This Count charges that, simultaneously with their pursuit of bribes from an unnamed developer ("Developer"), Hill, a former member of the Dallas City Council ("DCC") and Lee, a former member of the Dallas

---

[2] The Court also reserves for determination whether joinder of the tax evasion counts is proper.
[3] *See U.S. v. Lane*, 474 U.S. 438, 447 (1986).

City Planning Commission ("DCPC"), sought bribes from Brian and Cheryl Potashnik, owners of Southwest Housing Development Company, Inc. ("SWH"), in exchange for Hill and Lee's approving SWH's Arbor Woods development and two affordable housing tax credit projects in District 5, Rosemont at Laureland and Rosemont at Scyene. The latter two projects, which are the focal point of Count Ten, were in direct competition with Developer's two projects in District 5, Dallas West Village and Memorial Park Townhomes. Exploiting this competitive situation, Hill and Lee allegedly auctioned their votes to the highest bidding developer, accepting bribes from SWH in exchange for guaranteeing approval of its projects.

Hill and Lee allegedly funneled bribe payments from SWH through a nominee company, Farrington & Associates, established by Sheila Farrington, who is now Hill's wife. The Indictment alleges that Farrington & Associates created sham invoices for consulting services it allegedly provided to SWH. The Indictment also charges that Hill and Lee demanded that SWH enter into contracts at inflated rates with two other entities, Article IV Development ("Article IV") and Lynnea Consulting Group ("LCG"), on its Arbor Woods, Rosemont at Laureland, and Rosemont at Scyene projects. Spencer was a principal of Article IV and LCG. These contracts were allegedly used to conceal bribes from SWH to Hill, Lee, and Spencer.

The Indictment also alleges that Hill and Lee demanded that SWH contract with Robertson and a sham entity created by Slovacek, RON-SLO, Inc. ("RON-SLO"), on Arbor Woods, in exchange for Hill and Lee's approval of SWH's affordable housing tax credit projects. Hill and Lee allegedly insisted on SWH's insertion into its bid proposals of "sham deed restrictions" requiring levels of minority participation above those

mandated under law.[4] These restrictions were allegedly used to legitimize SWH's use of Hill and Lee's associates as sub-contractors. Slovacek and Robertson allegedly compensated Hill and Lee for pressuring SWH to contract with RON-SLO, by making payments to Farrington & Associates.

*Count Fifteen*

Count Fifteen charges ten Defendants, Kevin J. Dean, John J. Lewis, Darren L. Reagan, Allen J. McGill, Jibreel A. Rashad, Hill, Lee, Robertson, Spencer, and Slovacek with Conspiracy to Commit Extortion. Count Fifteen alleges that Hill and Lee conditioned their approval of affordable housing tax credit projects[5] for Developer— principally for Dallas West Village and Memorial Park Townhomes in District 5, and the Homes of Pecan Grove in District 8—on Developer's payment of bribes and use of Hill and Lee's associates as sub-contractors. The Indictment alleges that Hill and Lee would either postpone consideration, or urge the DCC or DCPC's rejection, of Developer's applications for zoning changes, 4% tax credits, and Texas Department of Housing and Community Affairs ("TDHCA") tax-exempt bonds on the Dallas West Village, Memorial Park, and Pecan Grove projects, until Developer complied with their demands.

The Indictment alleges that Hill and Lee relied on a network of their associates to carry out their scheme. According to the Indictment, Hill and Lee insisted that Developer enter into sham contracts with front companies created by these associates as a means of concealing paper trails of bribes transmitted to Hill and Lee by rival developers. Count

---

[4] The Texas Department of Housing and Community Affairs requires developers to include with their applications for 4% tax credits a certification that they will attempt to ensure that minority-owned businesses, also known as historically underutilized businesses, receive at least thirty percent of their construction sub-contracts.

[5] Count Fifteen also briefly mentions Developer's zoning change application for its project, Providence at Village Fair, in District 4.

Fifteen alleges, for example, that Hill and Lee insisted that Developer enter into a consulting contract with two sham minority organizations, the Black State Employees Association of Texas ("BSEAT") and the BSEAT Community Development Corporation ("BSEAT CDC"), of which Reagan was chairman and chief executive officer and McGill was president and vice chairman. Hill and Lee allegedly demanded that Developer insert "sham deed restrictions" into his bid proposals, which required that at least 40% of the contracts on his projects go to Historically Underutilized Businesses ("HUBs").

The Indictment also alleges that Rashad, Robertson, and Lee, who served as principals of Rashad-Millennium LLC ("RA-MILL"), and Spencer, who served as RA-MILL's business manager, insisted that Developer use RA-MILL as a contractor on the Homes of Pecan Grove and Dallas West Village projects. Reagan allegedly served as a liaison between RA-MILL, Hill, and Developer, updating Hill on Developer's compliance with demands made by Hill and RA-MILL.

Hill and RA-MILL also allegedly demanded that Developer use certain sub-contractors, such as Slovacek, on the Homes of Pecan Grove and Dallas West Village projects. After Developer allegedly refused to do so, Hill conditioned his approval of the zoning change application for Dallas West Village on Developer's contracting with Dean through KDAT, of which Dean was founder and principal. Hill and Dean allegedly agreed to use KDAT as the principal front through which to funnel bribes from Developer to Hill on five affordable housing projects. After Hill and Dean demanded that Developer contract with KDAT, Lewis, who was Dean's attorney, entered into an Attorney and Consultation Contract with Developer, which required Developer to pay Lewis's firm $50,000 for each of Developer's five projects, for a total of $250,000. The

Indictment charges that the Attorney and Consultation Contract was merely a sham to conceal these bribes.

Dean and Lewis's overt acts, detailed above, also form the factual predicate for the remaining conspiracy counts against them. The two other counts against Lewis— Count Seventeen, alleging Extortion by Public Officials and Aiding and Abetting, and Count Twenty, alleging Conspiracy to Commit Money Laundering—are premised on Lewis's collaboration with Dean and Developer on the Attorney and Consultation Contract. Similarly, the remaining count against Dean—Count Twenty, alleging Conspiracy to Commit Money Laundering, relies on Dean's extortion of Developer through KDAT.

**ANALYSIS**

*Whether joinder is proper under Rule 8(b)*

Under Federal Rule of Criminal Procedure 8(b), which governs the joinder of counts and defendants in an indictment, joinder of multiple defendants is proper when they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.[6] The Fifth Circuit has adopted a flexible interpretation of "transaction": even non-contemporaneous acts may form a single transaction if they are logically connected.[7] The Government may establish that several conspiracies are logically connected by demonstrating a common plan, scheme, or purpose.[8] The following considerations inform this determination: (1) whether there is a substantial identity of members in the schemes, particularly the involvement of a

---

[6] Fed. R. Crim. P. 8(b).
[7] *United States v. Park*, 531 F.2d 754, 761 (5th Cir. 1976).
[8] *Lane*, 735 F.2d at 805; *United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir. 1982).

common "key man"; [9] (2) whether participants in each scheme are aware of each other's existence and roles; [10] (3) whether the schemes reveal a common mode of operation; [11] (4) whether the schemes are contemporaneous; and (5) whether the activities of one scheme are "necessary or advantageous" to the "overall success of the venture." [12] Significantly, the form of the indictment, including the allegation of separate conspiracies, is not determinative of whether a common plan or scheme exists. [13]

The controlling question here is whether the acts underlying Counts Ten and Fifteen reflect a common plan and, therefore, were part of the same series of transactions under Rule 8(b). Dean and Lewis's principal contention is that no overarching objective unifies these Counts, which allege separate schemes rather than a single, overarching conspiracy. Further, Defendants maintain that Count Fifteen alleges two separate conspiracies. The Court disagrees with both contentions.

The Court first addresses Defendants' argument that Count Fifteen alleges, in fact, two separate conspiracies. Defendants maintain that the absence of references to Dean and Lewis in Count Fifteen prior to Overt Act 141 demonstrates the existence of separate schemes. This argument is unpersuasive for two principal reasons. First, Dean and Lewis's alleged extortion of Developer in connection with the Dallas West Village Project was contemporaneous with the other activities underlying Count Fifteen. Dean and Lewis's alleged overt acts commence on February 9, 2005, and conclude on June 10,

---

[9] *Id.*

[10] *Id.*

[11] *See United States v. Andrews,* 765 F.2d 1491, 1496-97 (11th Cir. 1985) ("Repetition of the same mode of operation may also provide a strong indication of a larger scheme behind numerous individual offenses."); *United States v. Scruschy*, 237 F.R.D. 464, 469-70 (M.D. Ala. 2006) (finding proper joinder where defendants charged in different counts with conspiring with elected official to commit deprivation of honest services, because they (a) conspired with the main actor, the elected official, and (b) shared a common objective to deprive the State of Alabama of the honest services of the governor).

[12] *Elam*, 678 F.2d at 1246.

[13] *United States v. Harrelson*, 754 F.2d 1153, 1176 (5th Cir. 1985).

2005. During that same period, Reagan was attempting to persuade Developer to execute an allegedly sham consulting contract with BSEAT CDC, which would have required Developer to use Hill and Lee's other associates as sub-contractors on the same Dallas West Village Project. Second, the substitution of Dean and Lewis for others of Hill and Lee's allegedly favored confederates does not establish a distinct scheme. Indeed, the conspiracy's alleged twin objectives remained unchanged: (1) to extract bribes from their associates—whether from Dean and Lewis or from their other confederates—in exchange for Hill and Lee's guaranteeing those associates contracts with Developer on the Dallas West Village Project; and (2) to use nominee entities—whether KDAT or BSEAT—to conceal bribe payments on this project. Hence, the Court concludes that the overt acts alleged under the sub-part Extortionate Demands Made through KDAT, and under the other sub-parts of Count Fifteen, emanate from a common scheme or plan and, therefore, constitute a single conspiracy.

The Court also rejects Defendants' contention that the acts underlying Counts Ten and Fifteen were not linked by a common scheme or plan. First, the logical interdependence of the schemes charged in Count Ten and Count Fifteen supports their classification as a single conspiracy. Each venture's success was intimately bound up with the other's. To extract the greatest possible bribes from both developers, simultaneous execution of both schemes was essential. A Texas law barring the award of 4% tax credits to any development that (1) was within one mile of another development, (2) served the same household type, and (3) had received a tax credit allocation in the previous three years, heightened the competition between Developer and SWH. By allegedly playing each developer against the other, and exploiting Developer and SWH's

competition for approval of affordable housing tax credits in District 5, Hill and Lee would be able to maximize payments from each. In fact, the Dallas City Council considered Developer and SWH's projects on the same day, October 27, 2004.[14] After SWH allegedly offered a substantial bribe to Hill, Hill moved on October 27, 2004 to deny resolutions supporting tax-exempt bonds and 4% tax credits for Developer's two projects, Dallas West Village and Memorial Park Townhomes. Hence, the *simultaneous* solicitation of bribes from SWH and Developer, while the DCC and DCPC were considering both developers' projects, enabled Hill and Lee effectively to auction their votes to the highest bidder, and thereby realize the largest possible payments from both. Thus, joint implementation of the schemes was necessary to achieve the overarching conspiracy's alleged larger objective —maximizing bribe receipts.

Joint implementation of the schemes alleged in Counts Ten and Fifteen created competitive pressures not only between SWH and Developer but also among Hill and Lee's associates, who vied for construction sub-contracts. These competitive pressures similarly advanced Hill and Lee's overarching objective of obtaining the maximum payments from their confederates. Because these confederates could not determine in advance which developer would offer the prevailing bribe, they were forced to solicit contracts from both developers. For example, Reagan, uncertain of which developer would emerge victorious, allegedly solicited sub-contracts from both Developer and SWH. In this way, by strategically accepting bribes from both Developer and SWH, rather than committing to support either in advance, Lee and Hill injected uncertainty, forcing their confederates to pay precautionary bribes to them.

---

[14] *See* Indict., Intro. ¶ 31.

Hill and Lee also allegedly capitalized on another competitive dynamic created by the joint implementation of both schemes. Their confederates were uncertain about not only which developer would prevail, but also about which associates would ultimately receive Hill and Lee's support. Sub-contractors offering the most generous bribes would be most likely to do so. Indeed, Reagan allegedly instructed McGill that all sub-contractors wishing to secure contracts on the Dallas West Village project were "gonna have to contribute to the kitty."[15] By allegedly exploiting these competitive pressures, Hill and Lee were able to obtain greater bribes from their confederates. Finally, by allegedly soliciting both Developer and SWH for bribes, Hill and Lee increased the total number of sub-contracts available "for sale" to their associates, thereby maximizing bribe payments. Thus, the interrelatedness of the two bribery schemes, each of which were "advantageous to . . . the overall success of the venture," supports their classification as a single conspiracy.

Second, the common mode of operation underlying the two schemes supports joinder. As the Eleventh Circuit stated in *United States v. Andrews*, "Repetition of the same mode of operation may also provide a strong indication of a larger scheme behind numerous individual offenses."[16] Here, in both endeavors, Hill and Lee allegedly conditioned approval of developers' affordable housing tax credit applications on their paying bribes and using favored sub-contractors. Further, Hill and Lee allegedly employed the same tactics, alternately postponing consideration, rejecting, or approving applications, to maximize the pressure on developers during bribery negotiations. Further, both ventures allegedly employed the same method—sham consulting contracts

---

[15] *See* Indict., Count Fifteen, *Extortionate Demands Made through BSEAT CDC and RA-MILL*, ¶ 98.
[16] 765 F.2d at 1496-97.

with shell companies created by Hill and Lee's associates—to conceal bribe payments. Specious deed restrictions, requiring minority participation above legally mandated levels, were also allegedly used in both schemes to legitimize the selection of Hill and Lee's confederates.

Third, the overlapping membership of the activities charged in Counts Ten and Fifteen warrants joinder. A majority of the Defendants named in Count Ten are also named in Count Fifteen. This "substantial identity" of participants supports classification of the two Counts as a single conspiracy.[17] Moreover, Hill and Lee are alleged to have relied on the same cadre of associates to obtain bribes from SWH and Developer, as reflected in Counts Ten and Fifteen. Every associate involved in the events described in Count Ten, excluding the Potashniks and Farrington, also allegedly participated in the events in Count Fifteen. A mere personnel change—the use of Farrington in the Count Ten events, and then Reagan, in the Count Fifteen events, to conceal bribes—does not establish separate conspiracies. As the Fifth Circuit observed in *United States v. Elam*, "a common plan is not transformed into several plans on account of internal personnel changes."[18] This is especially true when a conspirator and his replacement perform identical functions in both schemes. Here, Farrington & Associates and Reagan's nominee entity, BSEAT, assumed similar roles, allegedly operating as sham consulting companies to conceal bribes to Hill and Lee.

Hill and Lee not only relied on a similar cadre of confederates but also themselves allegedly assumed the same leadership roles in both ventures. As the Fifth Circuit stated in *Elam*, two schemes are more likely to constitute a single conspiracy when a "'key

---

[17] *United States v. Dennis*, 645 F.2d 517, 520 (5th Cir. Unit B 1981).
[18] 678 F.2d at 1246.

man' was involved and directed illegal activities, while various combinations of other defendants exerted individual efforts towards a common goal."[19] Here, Hill and Lee allegedly spearheaded all of the alleged actions in both conspiracies, manipulating the levers of power to extract bribes from two developers. As political gatekeepers for affordable housing projects, they are alleged to have alternately postponed consideration, rejected, or approved Developer and SWH's tax credit applications in order to enrich themselves and their associates.

Fourth, the alleged participants' mutual awareness of their participation in the two schemes supports finding a single conspiracy. In *Elam*, the court emphasized that two or more criminal endeavors are especially likely to constitute one conspiracy when "members of one enterprise have knowledge, actual or implied, of the existence of members of a related enterprise."[20] Participants' mastery of the details of the alleged schemes is not required to find a single conspiracy: their knowledge of the plans' general contours is sufficient. As the Fifth Circuit stated in *Elam*, "We do not imply that the various members of a conspiracy which functions through a division of labor must have an awareness of the existence of the other members, or be privy to the details of each aspect of the conspiracy." Here, the allegations of the Indictment strongly suggest that the few confederates not named in both Counts Ten and Fifteen likely knew of each other's existence and roles. For example, Reagan, named in Count Fifteen but not in Count Ten, was likely aware of Hill's extortion of SWH, charged in Count Ten. The Indictment alleges that Reagan personally sent Brian Potashnik a contract proposal for Rosemont at Laureland and Rosemont at Scyene on October 14, 2004. Reagan's

---

[19] *Id.*
[20] *Id.*

transmission of the proposal suggests knowledge that Hill had conditioned approval of

SWH's projects on the use of Reagan's services. Indeed, eight days later, Hill allegedly

accepted a bribe from Brian Potashnik and moved the DCC to approve resolutions

supporting tax-exempt bonds and 4% tax credits for both Rosemont projects. These

factual allegations support the inference that Reagan was aware of Hill's efforts to obtain

bribes from SWH, and had a substantial stake in their success.

Reagan was not the only participant in the alleged extortion scheme likely aware

of the simultaneous bribery venture with SWH. Rashad was also likely alerted to the

SWH scheme through his business partners, Lee and Robertson. Lee and Robertson,

named in Count Ten, both allegedly assumed significant roles in the SWH scheme and

were co-principals with Rashad in RA-MILL. Given Lee and Robertson's intimate

involvement in the SWH bribery scheme, and their close business relationship with

Rashad through RA-MILL, it may be inferred that Rashad was aware of their efforts to

obtain sham contracts with SWH.[21]  Further, not only Hill and Lee's confederates, but

also the developers themselves, were apparently aware of the concurrent schemes, which

allegedly attempted to play the developers off of each other to obtain the greatest

payments. Finally, Farrington allegedly had a professional, as well as a romantic,

relationship with Hill, the venture's alleged ringleader, and her participation in one set of

events designed to conceal bribes to Hill supports an inference that he made her aware of

other similar efforts. Thus, joinder is supported by the fact that the Defendants named in

---

[21] *See Elam*, 678 F.2d at 1246 (finding a single conspiracy where the overlapping nature of the various roles
of the participants and the nature of the alleged activities is "such that knowledge on the part of one
member concerning the existence and function of other members of the same scheme is necessarily
implied").

Count Ten are alleged to have either directly participated in, or at least had implied knowledge of, the simultaneous scheme to extort money from Developer.

Fifth, the temporal proximity of the activities alleged in Counts Ten and Fifteen supports joinder. The Indictment alleges that the activities in Counts Ten and Fifteen allegedly began at least in August 2004 and ran until June 2005. Further, the DCC's consideration of Developer and SWH's competing affordable housing applications in District 5 occurred on the same day, October 27, 2004.[22]

Defendants analogize this case to *United States v. Nettles*, in which the Fifth Circuit denied joinder. In *Nettles*, three police offers conspired to provide protection to two local gambling enterprises in exchange for bribes. The three officers separately approached the two enterprises, which were not related or affiliated in any way. Further, there was no evidence that either gambling enterprise was aware of the protection provided by the officers to the other. The Court denied joinder on two broad grounds. First, the schemes, undertaken separately, were not united by a common aim. Second, while the police struck similar deals with both enterprises, there was no logical interdependence between the schemes: "the connection between different groups is limited to a few individuals common to each but those individuals commit[ted] separate acts which involve them in separate offenses."[23] Implementation of one operation in no way contributed to the success of the other.

Here, in contrast, joint pursuit of the extortion and bribery schemes, which heightened competition between the developers, as well as among Hill and Lee's associates, allegedly enabled Hill, Lee, and the others to obtain the largest possible

---

[22] *See* Indict., Intro. ¶ 31.
[23] *United States of America v. Nettles*, 570 F.2d 547, 551 (5th Cir. 1978).

payments from the developers and Hill and Lee's associates. In this way, Dean and Lewis's alleged extortion of Developer, as described in Count Fifteen, was not tangential to the bribery scheme alleged in Count Ten, but rather contributed directly to that venture's success. Further, in *Nettles* only three individuals participated in both conspiracies. Here, the confederates named in Count Ten, to whom Hill and Lee funneled sub-contracts from the developers, were also named in Count Fifteen, with the exception of Farrington. Further, even if Dean and Lewis did not participate in the scheme alleged in Count Ten, their relationship with Hill, the scheme's ringleader, suggests that they were likely aware of that venture and its participants' identities.

Defendants' citation of the district court's decision in *United States v. Lech* is unavailing for similar reasons.[24] There, the Court concluded that three bribery schemes did not constitute a single conspiracy and, therefore, joinder was improper. The Court specifically focused on two projects charged in the Indictment: bribery in connection with a construction project, and bribery of the New York City Board of Education to obtain an asbestos removal contract. The named conspirators in the charges underlying these two projects were identical, except that Defendant Lech was an additional participant in the asbestos scheme. Despite the two projects' nearly identical membership, the Court found Lech's apparent ignorance of the construction scheme dispositive, emphasizing that "Lech had very little, if any, knowledge of the other schemes, and did not participate in them."[25]

Here, in sharp contrast to *Lech*, the bribery and extortion schemes alleged in Counts Ten and Fifteen were logically connected, because of the intense competition

---

[24] 161 F.R.D. 255, 256 (S.D.N.Y. 1995).
[25] *Id.* at 257.

between SWH and Developer for affordable housing tax credits in District 5. Hence, unlike Lech's efforts, which solely advanced the asbestos removal scheme in which he was a named participant, Dean and Lewis's activities assisted the scheme alleged in Count Fifteen *and* contributed to Hill and Lee's success in obtaining bribes from SWH in Count Ten.

Finally, *United States v. Levine*, also cited by Defendants, is inapposite to the instant case.[26] There, a pornographic film producer, Harvard, spearheaded two separate schemes in violation of various obscenity laws. Four Defendants—Harvard, Abrams, Remy, and Pictograph—participated in the first scheme. Harvard and Abrams essentially agreed that the latter would finance, and the former would produce, a pornographic film, entitled "Valley of the Nymphs" ("Nymphs"). During the same time period, the second scheme unfolded. Harvard agreed to produce eighteen sexually explicit films for Defendant Levine. Levine did not know Abrams and was unaware of his agreement with Harvard or of the Nymphs movie. However, Nymphs and the eighteen movies produced for Levine employed some of the same actors and relied on the same processing laboratory and sound studios. The Court concluded that the two projects, which emanated from separate combinations involving different defendants and separate transactions, did not constitute a single conspiracy. Defendants' attempt to analogize *Levine* to the instant case fails. Unlike in *Levine*, the criminal projects alleged in Counts Ten and Fifteen were logically related: joint pursuit of both was necessary to achieve the conspirators' overarching objectives.

---

[26] 546 F.2d 658 (5th Cir. 1977).

Therefore, Dean and Lewis's alleged activities, which made them key participants in the larger affordable housing scheme charged in Counts Ten and Fifteen, warrant joinder under Rule 8(b).

*Whether severance is warranted under Rule 14(a)*

If joinder is proper under Rule 8(b), a district court may, nonetheless, grant a motion to sever under limited circumstances under Fed. R. Crim. P. 14(a). Severance is warranted under Rule 14(a) when there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable determination of guilt or innocence.[27] To obtain a severance, the defendant must demonstrate specific and compelling prejudice.[28] Because only "the most compelling prejudice against which the trial court will be unable to afford protection" warrants severance under Rule 14(a), motions to sever are rarely granted.[29]

To support severance under Rule 14(a), Defendants offer several arguments. Dean specifically contends that the Government's presentation of complex evidence on the other thirteen Defendants would "spill over," tainting the jury's assessment of his guilt. Lewis argues for severance on three grounds. First, joinder would unreasonably delay his trial, needlessly prolonging his pretrial anxiety and the imposition of pretrial release conditions. Second, delay would buy the Government time to "flip" additional witnesses, strengthening its case against Lewis. Third, joinder could impair the presentation of Lewis's defense because some defense witnesses, including Comer Cottrell, who has deteriorating health, might become unavailable if Lewis's trial is delayed. The Court addresses Dean and Lewis's respective arguments in turn.

---

[27] *Zafiro v. United States*, 506 U.S. 534, 539 (1993).
[28] *United States v. Krenning*, 93 F.3d 1257, 1267 (5th Cir. 1996).
[29] *United States v. Perez*, 489 F.2d 51, 65 (5th Cir. 1974).

Dean's contention that joinder would prejudice his defense rests on a simple proposition: the Government's presentation of complex evidence on the other thirteen defendants would "spill over," causing the jury to convict him without carefully parsing the evidence. Dean acknowledges that the risk that evidence implicating other Defendants will taint him rarely constitutes prejudice. However, he insists that the complexity of the case, involving six separate conspiracies, is exceptional. However, the sole case cited by Dean, the Supreme Court's decision in *Zafiro v. United States*, actually affirmed the appellate court's denial of severance, noting in the process that "limiting instructions often will suffice to cure any risk of prejudice" from a joint trial. The Fifth Circuit's reasoning in *Levine*, detailing the prophylactic measures available to avoid taint, is also fatal to Dean's contention:

> Of course the possibility exists that evidence introduced to prove one count in an indictment will spill over and taint the case on another count. A jury might intertwine the evidence and thereby improperly lessen a defendant's prospects of being acquitted as to a joint count. Submission of proper, limiting instructions to the jury, accompanied by a strict charge as to what testimony it may and may not consider, and the continuing obligation of a trial court to grant a severance under Rule 14 of the Federal Rules of Criminal Procedure if prejudice to any defendant appears, are considered to be adequate safeguards against these prospects.

Thus, the risk that other conspirators' guilt will taint the jury's evaluation of Dean's conduct does not establish compelling prejudice warranting severance under Rule 14(a).

Lewis's three asserted grounds for severance are also unpersuasive. Lewis's first and second contentions are that *United States v. Hall*[30] and *United States v. Messer*[31] identify unreasonable delay as grounds for severance under Rule 14(a). In *Hall*, a drug conspiracy case, one of the two defendants, Hall, repeatedly invoked his speedy trial

---

[30] 181 F.3d 1057 (9th Cir. 1999).
[31] 197 F.3d 330 (9th Cir. 1999).

rights, while the other, Nelson, repeatedly requested continuances. In granting these continuances, the district court did not fulfill its responsibility to determine their impact on Hall's speedy trial rights. Further, only days before the trial, Nelson signed a plea deal, indicating his readiness to testify against Hall. In assessing the reasonableness of the delay, the court specifically examined whether the delay was necessary to achieve its purpose, and whether there was any actual prejudice suffered by the non-pleading Defendant. The Ninth Circuit concluded that Hall's trial had been unreasonably delayed, because the Government's motion was calculated to procure a critical, additional witness, thereby "impairing his [Hall's] defense at trial."

Here, in contrast to *Hall*, the complexity of the case, rather than a plan to secure plea deals, apparently underlay the continuance of this case, which was pursued aggressively by most Defendants. Lewis does not identify witnesses who the Government hopes will "flip." Moreover, unlike in *Hall*, the Court can always reconsider future Motions to Sever, particularly if the Government or other Defendants seek additional continuances.

In *Messer*, a two-defendant money laundering case, the Ninth Circuit granted a first continuance because of the legal and factual complexity of the case.[32] Over the next twenty-one months, the court granted four additional continuances. Although the Ninth Circuit found that the Defendants' release during the twenty one-month interval diminished the prejudice, it found the delay was unreasonable. The Court focused particularly on the Defendants' repeated invocation of their speedy trial rights and the "sheer length of the delay."

---

[32] 197 F.3d at 334.

Here, trial is set for June 9, 2008, less than nine months after the filing of the Indictment (although it may be reset to the fall of 2008). This represents a shorter period than that involved in *Messer*. Additional continuances are unlikely. There is no evidence of an improper purpose associated with the requested continuance, including an effort to induce individuals to "flip."

Lewis's final contention is that joinder could impair the presentation of his defense because some defense witnesses, including Comer Cottrell, whose health is declining, may become unavailable if Lewis's trial is delayed. Although Lewis has offered no evidence regarding the imminence, severity, or likely effects of Mr. Cottrell's health on his ability to testify, or any indication of the significant facts to be established by Mr. Cottrell's testimony, the Government has confirmed it will not oppose Lewis's deposing Mr. Cottrell now to preserve his testimony, mitigating any prejudice Mr. Cottrell's absence at trial might cause.

For the foregoing reasons, Lewis and Dean's request for severance under Rule 14(a) is untenable. Lewis and Dean's Motions to Sever are thus **DENIED**.

**SO ORDERED**.

January 18, 2008.

_____
**BARBARA M.G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**